# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

<table>
<tr><td>

**UNITED STATES OF AMERICA,**

**vs.**

**JONATHAN MOZEAK,**

*Defendant.*

</td><td>

**DOCKET NO. 3:24-CR-261-MEO**

**MOTION TO SUPPRESS FRUITS OF UNCONSTITUTIONAL STOP AND SEIZURE**

***& INCORPORATED MEMORANDUM OF LAW***

</td></tr>
</table>

Jonathan Mozeak, by and through his counsel of record, Assistant Federal Defender John Parke Davis, respectfully requests that this Court suppress the fruits of the unconstitutional stop of Mr. Mozeak on November 30, 2020. As grounds therefore, it is averred:

### I-    FACTUAL BACKGROUND

1.    On November 30, 2020, Mr. Mozeak and Tina Davis, a then-52-year old real estate agent from Charlotte, were driving through Oklahoma in a rented black GMC Yukon ("the Yukon"), as part of a cross-country trip from North Carolina to California.

2.    On Interstate 40 near Oklahoma City, an Oklahoma State Trooper working in interdiction, Officer Justin Taylor, began following the Yukon. According to Taylor,[1] he began following the Yukon and ultimately determined to stop it because it was going 3 miles per hour over the posted speed limit across two different speed zones. That is, it appeared to be going 68

---

[1] Though there are some indications that this stop may not have actually been random, the government has disclaimed the existence of any preexisting tip or averred that the stop is justified solely by independent bases. As such, the Court should address only those independent bases in determining this motion. *See United States v. Bowman*, 884 F.3d 200 (4th Cir. 2018) (suppressing fruits of search resulting from traffic stop, even though officer had a tip—including descriptions of car, its occupants, and its license plate number—that car would be carrying drugs, because government disclaimed reliance on the tip and claimed instead that the stop and search were supported by independently developed reasonable suspicion).

miles per hour in a 65 mile per hour zone, then (while Taylor was following it in his marked vehicle) sped up to 73 miles per hour when the speed limit changed to 70 miles per hour.

3. Taylor approached the vehicle on the passenger side, where Davis was sitting, and spoke to the driver, Mr. Mozeak, through the open passenger-side window. Taylor told Mr. Mozeak he would give him a warning ticket and asked him to accompany him back to his police vehicle to run a license check.

4. While ostensibly running a license check with Mr. Mozeak in the passenger seat of his car, Taylor questioned Mr. Mozeak regarding the nature and purpose of their trip. This exchange is captured in two videos from a dashboard camera in Taylor's patrol vehicle (the "dashcam video"). Copies of these videos are incorporated herein by reference as **Exhibits A-1** and **A-2**, respectively.[2]

5. In the dashcam video, Mr. Mozeak is friendly and relaxed, exhibiting no signs of discomfort or nervousness. Mr. Mozeak explained that he was driving a rental car from Charlotte to Los Angeles, California, to see friends from his time in the United States Marine Corps. When asked, he provided the friend's name, their relationship and how long they had known each other, details of his own employment, and all other information asked of him, all without hesitation.

6. According to a report generated by Taylor after the fact, which is attached hereto as **Exhibit B**, Taylor called for a K9 unit at "approximately 3 minutes and 47 seconds into my traffic stop," right after Mr. Mozeak told Taylor his destination was California. Ex. B at 3. It is not clear when this occurs on the dashcam video, but Mr. Mozeak stated his destination almost

---

[2] As video exhibits, these will be provided to chambers directly via an electronic storage medium. W.D.N.C. Admin. Order Governing Filing by Elect. Means § V(G) (Dec. 1 2022). A placeholder for these exhibits is attached to this motion.

immediately upon getting into Taylor's car.[3] According to Taylor's report, he "believe [sic] criminal activity was taking place" after Mr. Mozeak further clarified that his destination in California was Los Angeles.

7.      At approximately nine minutes into the stop, Taylor retrieved the rental agreement from the Yukon, speaking to Davis, who remained in the passenger seat, in the process. Taylor's report states that he asked Davis "where they were headed," and Davis responded, "We are on a mission, to Arizona." Ex. B at 3. Davis's actual statements are inaudible on the dashcam video, but she later explained that she had been saying the two were on a mission to get *through* New Mexico and Arizona due to spikes in COVID-19 cases in those two states at the time.

8.      Consistent with her intent to say they were on their way to pass through New Mexico and Arizona, Davis handed Taylor the rental agreement during that same conversation. That rental agreement—made by Davis, in her own name—showed that their destination was Los Angeles, California. *See* Ex. B at 3.

9.      After Taylor returned to his car from speaking to Davis, another officer arrived on the scene at approximately 16 minutes and 20 seconds into the stop, presumably in response to Taylor's call for backup. Ex. A-1 at 28:00. In the dashcam video, Taylor exits his vehicle and tells the other officer "I think there's going to be a large amount of US currency inside the car." *Id.* at

---

[3] Due to an unknown technical issue, the run time displayed when viewing the first dashcam video (Exhibit A-1) jumps forward at the "1:23" mark by 11 minutes and 40 seconds, to the "13:03" mark. This does not appear to correspond to any loss of footage, but does make discussing the times involved more difficult, particularly because the footage doesn't bear any kind of independent time stamp.

To determine how much time has actually elapsed during the stop, then, the viewer must subtract 11 minutes and 40 seconds from the displayed number. Thus, for example, the point at which Taylor asks "What brings you to Oklahoma?" and Mr. Mozeak responds "I'm going to California, man," occurs at the "14:40" mark in the video, but this translates to only 3 minutes of actual time elapsed from the beginning of the video.

For clear identification, this motion will refer to the times in both Exhibits A-1 and A-2 as they are actually displayed in the program. Wherever relevant, the actual time elapsed from the start of the video will be identified in the text.

28:10. Taylor makes clear in this conversation that he has already determined to search the vehicle.

10. At the approximately 21 minutes and 20 seconds into the stop, Taylor prints out what appears to be the warning ticket he was working on and tells Mr. Mozeak that he is being detained because law enforcement is going to search his car. Ex. A-1 at 33:00. At that point, the K9 unit still had not arrived on scene.

11. In his report, Taylor claimed that while standing by the passenger side of the vehicle and speaking to Davis to retrieve the rental agreement, he smelled the odor of "raw" (i.e., unburnt) marijuana. Ex. B at 3. At that point, however, Taylor was positioned in the exact same place as he was when he first spoke to Mr. Mozeak, at a point where he did not claim to smell marijuana. *Compare* Ex. A-1 at 13:25-14:03 *with* 20:50-22:12.

12. There is no evidence that either Davis or Mr. Mozeak have *ever* smoked marijuana, and no signs of marijuana were in fact found inside the vehicle. While several other officers were on scene throughout the stop, no others mention the smell of marijuana on the dashcam video, and Taylor is the only officer to have reported smelling marijuana.

13. Later in the stop, Taylor would claim to both Mr. Mozeak and to Davis, independently, that he smelled marijuana. Both, independently, responded with disbelief.

   a. After Mr. Mozeak has already denied the presence of marijuana or smoking marijuana and was subsequently informed he was being detained for a search regardless, Mr. Mozeak asks, in disbelieving tone, "Did you smell marijuana, for real?" Ex. A-1 at 33:26.

   b. At one point, Mr. Mozeak and Davis can be heard talking in the back of the police car, at a point where it would not have been apparent to them that they were being recorded. Most of this conversation is inaudible, but at one point

Mr. Mozeak can be heard exclaiming in an incredulous manner, "We ain't got no drugs!" *Id.* at 54:40-45. Davis can be heard responding "I don't know why [inaudible], that's a *lie* that he could smell [inaudible] marijuana, we don't even *smoke* marijuana."

c.   Later, after the car was searched and no sign of any marijuana was located, Davis stated to Taylor, "the marijuana you said you smelled, where's it at? … I don't smoke anything and with my asthma I can smell everything, and I didn't smell it when I got in it." Ex. A-2 at 9:54.

14.   In response to Davis's questioning, Taylor attempted to explain how he could smell something she couldn't by claiming the smell would have come from the currency itself: "With that kind of money, marijuana sits on money, and the odor can emit." Ex. A-2 at 10:19. As Taylor noted later in the stop, however, the money was "vacuum-sealed" in plastic bags. *Id.* at 30:54. Vacuum-sealing is a process that prevents even large amounts of raw marijuana from emitting detectable odors, and therefore would have blocked any residual smell that might have clung to money. *See* Avery N. Gilbert & Joseph A. Diverdi, *Human olfactory detection of packaged cannabis*, 60 Science & Justice 169 (March 2020) (test subjects were unable to detect marijuana smell in two-gallon buckets containing marijuana in vacuum-sealed bags).

15.   At approximately 31 minutes and 20 seconds into the stop, a K9 unit finally arrived on scene. Ex. A-1 at 43:00. In his report, Taylor states he had the K9 unit "run around the vehicle" and the K9 alerted. Ex. B at 3. The dashcam video shows that the K9 was walked directly to the rear driver's side corner of the vehicle, allowed to jump on the vehicle several times, then removed. Ex. A-1 at 43:11-44:24. It is unclear how, when, or if the K9 alerted.

16.   After the K9 alert, officers immediately opened the trunk, pulled open a large black

suitcase, and searched it. Inside, they found $383,590 in United States currency in plastic vacuum-sealed bags. Ex. A-1 at 45:15 (discovery of money); Ex. A-2 at 30:54 (discussing bags being vacuum-sealed); *id.* at 21:50-22:00 (showing vacuum-sealed bags); Ex. B at 3 (listing currency total). No signs of any narcotics—marijuana or otherwise—were located.

## II- TAYLOR UNLAWFULLY EXTENDED THE TRAFFIC STOP WITHOUT REASONABLE SUSPICION OR PROBABLE CAUSE

### a. Taylor prolonged the traffic stop beyond its reasonable mission.

17.     "The Fourth Amendment protects '[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures.' U.S. Const. amend. IV." *United States v. Black*, 707 F.3d 531, 537 (4th Cir. 2013). "A traffic stop constitutes a 'seizure' under the Fourth Amendment and is thus subject to a reasonableness requirement." *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)).

18.     "A routine traffic stop becomes un unreasonable seizure when law enforcement impermissibly exceeds the stop's scope or duration." *United States v. Hill*, 849 F.3d 195, 200 (4th Cir. 2017). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, . . . and attend to related safety concerns[.]" *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). The "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354. In other words, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id*. at 350.

19.     Here, Taylor stopped the Yukon for going three miles above the posted speed limit across two different speed zones—a practice more consistent with a mis-calibrated speedometer than actual speeding—and determined to issue a warning ticket. Taylor actually printed the

warning ticket approximately 22 minutes into the stop. Ex. A-1 at 33:33 (21 minutes and 56 seconds into stop). The K9 unit did not arrive to perform a sniff test for an additional ten minutes after that. *Id.* at 43:00.

20.     Twenty-two minutes is a lengthy period of time to create a warning ticket, and the purpose of many of Taylor's actions during this time is unclear. There is some reason to believe that Taylor—who had called for a K9 unit less than four minutes into the stop—was intentionally delaying the stop to buy time for his investigate. *See* Ex. A-1 at 28:03-29:10 (using more than a full minute to speak to another officer about his desire to search the vehicle and to inquire about available K9 units, rather than conducting legitimate traffic-based procedures). This time, and any other substantial time spent arranging for further investigation at the expense of the underlying stop, constitutes an unnecessary and unconstitutional prolongation. *See United States v. Frazier*, 20 F.4th 1165, 1173 (10th Cir. 2022) (holding it was "clear" that spending approximately 3 minutes out of a 20-minute stop to arrange for a dog sniff had impermissibly "diverted from the traffic-based mission of the stop").[4]

21.     Regardless of what happened earlier, however, the purpose of the stop was indisputably complete once the warning ticket was printed. At that point, the Fourth Circuit has held that "[i]f a police officer seeks to prolong a traffic stop to allow for investigation into a matter outside the scope of the initial stop, he must possess reasonable suspicion or receive the driver's

---

[4] Curiously, *Frazier* explicitly states that its holding is "at odds with the Fourth Circuit's decision in *United States v. Hill*," which found that calling for a K9 unit did not impermissibly delay a stop. *Frazier*, 30 F.4th at FN2 (citing *Hill*, 852 F.3d at 384). This appears to be a misreading of *Hill* rather than a genuine circuit split, however, as the two cases are readily distinguishable and their holdings are compatible. *Hill* did not find that time spent calling for a K9 mid-stop will *never* impermissibly delay a traffic stop as a matter of law. Rather, it upheld that the district court's finding that a call for a K9 unit had not prolonged the stop at issue *as a matter of fact*, given the K9 was called during a record check, there was no evidence that the call delayed the stop by any additional time whatsoever, and the dog itself was never even deployed. *Hill*, 852 F.3d at 384. *Frazier*, by contrast, involved a distinct time loss, in that the officer was arranging for the K9 unit rather than performing other tasks. *Frazier*, 20 F.4th at 1171 (noting that officer spent three minutes arranging for a K-9 unit before "begin[ning] standard procedures necessary to issue a citation"). There is no reason to believe the *Hill* court would have disagreed with that conclusion.

consent." *United States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir. 2011) (citing *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008)). Here, Taylor specifically requested consent, and was denied. Ex. A-1 at 32:47-53. Thus, the stop can only pass constitutional muster if Taylor had at least a reasonable suspicion of criminal activity justifying the continued seizure.

22.     Taylor's report and his statements on scene, taken together, cited to several bases for prolonging the stop. These can be placed into three essential groups: 1) the general nature of the trip itself—that is, that Mr. Mozeak and Davis were driving coast-to-coast; that the trip was going to the city of Los Angeles; that they had a one-way rental with a return flight; and that the car had a "lived-in look" with "multiple cell phones" and "several small luggage bags;" 2) the supposed "discrepancy" in travel plans between Mr. Mozeak and Davis; and 3) the supposed smell of marijuana. Ex. B at 3. None of these justifications pass muster.

       *b.   The nature of the trip did not create reasonable suspicion to prolong the stop.*

23.     The reasonable suspicion inquiry requires the Court to consider the totality of the circumstances to determine if the officer had a "particularized and objective basis for suspecting criminal activity." *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016). The detaining officer must be able "to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015) (quoting *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011)). An "inarticulate hunch[ ]" is not enough. *United States v. Drakeford*, 992 F.3d 255, 262-63 (4th Cir. 2021). While "[s]eemingly innocent factors, when viewed together, can amount to reasonable suspicion," "the presence of additional facts might dispel reasonable suspicion." *Id.* at 263 (quoting *Kansas v. Glover*, 140 S. Ct. 1183, 1191 (2020)).

24.      Moreover, courts are "skeptical of Government attempts to spin . . . largely mundane acts into a web of deception." *Foster,* 634 F.3d at 248.  The government cannot "meet its *Terry* burden by patching together a set of innocent, suspicion-free facts, which cannot rationally be relied on to establish reasonable suspicion." *Black*, 707 F.3d at 539 (4th Cir. 2013). "[A]n officer and the government must do more than simply label a behavior 'suspicious' to make it so." *Foster,* 634 F.3d at 248. "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." *Terry*, 392 U.S. at 22.

25.      Here, the entirety of Taylor's suspicion regarding the trip itself can be boiled down to the fact that Mr. Mozeak and Davis were driving across country and flying home a few days later. But there is nothing inherently suspicious about this behavior. The cross-country road trip is a staple of Americana and a common desire of many Americans. *See, e.g.* Hugo Martin, "Many Americans dream of driving across country, survey shows," Los Angeles Times (Mar. 5, 2012)[5] (reporting that 25% of American men and 33% of American women said they had not driven across country but "always wanted to," in addition to a full 41% of all Americans saying they already had driven across country.) Given that most of the people in America either actively want to or already have done it, there is nothing inherently suspicious about people driving across the country.

26.      Nor is there anything inherently suspicious about someone deciding to use a relatively brief period of time off to accomplish that goal. Notably, the stop in this case occurred on the Sunday after Thanksgiving, a time when many Americans take additional time off work for one reason or other. There is nothing inherently criminal about the idea of a couple in their 40s

---

[5] Available at https://www.latimes.com/archives/la-xpm-2012-mar-05-la-fi-0305-travel-briefcase-20120305-story.html (last visited Jan. 21, 2026).

and 50s taking a few extra days after a holiday to drive across country together, see old friends and look at real estate. Indeed, most people would see that behavior as heartwarming, not criminal.

27. Following from that, there likewise is nothing peculiar about the idea that people taking such a short-term trip would decide to fly back rather than driving both ways. It is perfectly reasonable for road-tripping Americans, particularly those with a limited amount of time off, to decide that taking such a grueling trip would only be feasible—whether for lack of time, stamina, or both—in one direction. Renting a car for the drive and then returning by air is a perfectly sensible approach to those concerns.

28. With that established, the rest of Taylor's concerns about the trip are effectively illusory. He does nothing to explain why, for example, the "lived-in" look of the vehicle would indicate anything other than that Mr. Mozeak and Davis were using it drive across country, exactly as they had stated. Likewise, he fails to explain why two people carrying "several" small bags on a cross-country trip would be suspicious. Indeed, if both Mr. Mozeak and Davis were carrying a small piece of luggage and a backpack—a very reasonable amount of luggage for a cross-country trip—then simply adding in Davis's purse would reach the number of bags actually found in the Yukon.[6]

29. Similarly, Taylor does not even explain how many cell phones were in the vehicle, instead using the word "multiple," which could be as little as two, one for each occupant. Regardless of the total, Taylor does not explain how *any* specific number of cell phones in the car would be relevant to the reasonable suspicion analysis.

30. Finally, the fact that the city of Los Angeles was Mr. Mozeak's destination is

---

[6] Taylor's report states there were a total of five bags when he was finally able to count after the search. Ex. B at 3. A small travel bag and a backpack are visible in the rear of the Yukon during the search, both corresponding to what Mr. Mozeak told Taylor belonged to him. No evidence of the other bags, including whether a purse is among them, exists in discovery.

meaningless. Los Angeles is the second largest city in the United States, and one of the largest economies in the world. It no doubt does indeed contain drug dealers. It also contains millions of law-abiding citizens living upright, respectable lives. It houses the nation's entertainment industry, tech companies, international trade industries, military bases, beaches, and a variety of tourist attractions. There are innumerable legitimate reasons why anyone would want to visit Los Angeles. The fact that someone traveling to the West Coast would want to go the largest city on the West Coast is unremarkable, not inherently suspicious.

       *c. Davis's statements about their destination, particularly in context, did not transform innocuous facts into suspicious ones.*

31. As the Fourth Circuit recently affirmed, "[m]inor and reconcilable inconsistencies between a driver's and passenger's statements do not give rise to reasonable suspicion of criminal activity." *United States v. Hawkins*, 161 F.4th 242, 248 (4th Cir. 2025) (citing *United States v. Pack*, 612 F.3d 341, 358–60 (5th Cir. 2010)). In *Hawkins*, officers followed a car with two men, Williams and Johnson, in it, while they met a third man, Byrd, in an apartment complex parking lot. *Id.* at 244. Believing they had witnessed a drug transaction, officers had the car stopped based on legitimate traffic violations after it left the parking lot. *Id.* at 245.

32. On questioning, Johnson and Williams gave what the officer considered to be conflicting accounts of their meeting with Byrd. Specifically, Williams initially denied meeting anyone in the parking lot, then on specific questioning said Byrd had asked for a cigarette. *Id.* Johnson, meanwhile, said that Byrd was someone he knew who was asking him about a job. *Id.* Based on these statements, the officers called for a K9 unit, which alerted. No drugs were located, but the officers did find a contraband firearm on the defendant, who had gotten in the car after the meeting with Byrd. *Id.*

33. The Fourth Circuit suppressed, holding the officers lacked reasonable suspicion of

criminal activity to hold the men for a K9 search. *Hawkins*, 161 F.4th at 248-49. Specifically, the Court found that Williams and Johnson's statements were largely consistent, both acknowledging having come from the apartment complex and both having acknowledged meeting Byrd. *Id.* at 248. The inconsistencies between the two were "minor and reconcilable." *Id.* "The fact that Williams stated Byrd was asking for a cigarette and that Johnson stated Byrd was asking about a job are not contradictory," the Court held, because "[b]oth answers could have been true." *Id.* Accordingly, the Court gave these inconsistencies little weight in the reasonable suspicion analysis. *Id.*

34.     Similarly, here, Mr. Mozeak and Davis's statements were largely consistent, particularly in their larger context. Both Mr. Mozeak and Davis stated that they were coming from the Carolinas and passing through Oklahoma on their way west. Both identified the vehicle as a rental, and both gave similar estimations of how long their trip would be. *Compare* Ex A-1 at 16:10 (Mr. Mozeak stating—at 2:40 AM on a Sunday—that they would be out for "about three days") *with id.* at 21:54 (Davis stating that she had to be back at work on Wednesday).

35.     Any inconsistency in these statements was "minor and reconcilable." *Hawkins*, 161 F.4th at 248. Mr. Mozeak stated their destination was California. Davis stated that they were headed through Oklahoma "on a mission to" New Mexico and Arizona. In order to reach California from Oklahoma, the two necessarily had to travel to New Mexico and Arizona. Even assuming *arguendo* that Davis did not make it clear that she meant going *through* Arizona, her statements about where they were headed next were accurate and reconcilable with Mr. Mozeak's statement of their ultimate destination.

36.     Moreover, Davis's statements were made while she was actively handing Taylor the rental agreement for the Yukon, and when she could see that he was reading it. According to

Taylor, the rental agreement showed on its face that the trip's destination was California, and Davis would have known that since she was the one who made the agreement in the first place. As such, her statements about being on a mission to New Mexico and Arizona must be viewed in context of her simultaneously presenting Taylor with paperwork showing their ultimate destination lay on the other side of those two states.

37. Indeed, the rental agreement actively corroborated Mr. Mozeak's earlier statements to Taylor. This consistent detail should have, at a minimum, undermined any suspicion Taylor might have formed about the supposed inconsistency, and led him to recognize that Davis's statements were actually in context of the document she'd just handed him, not in contradiction of it. *See Drakeford*, 992 F.3d at 263 (noting that totality of the circumstances test requires consideration of facts undermining suspicion as well as those supporting it.)

> d. *Taylor's uncorroborated claim to smell "raw" marijuana is not credible.*

38. Finally, Taylor's claim to have smelled marijuana simply is not credible. To begin with, there is no evidence that there was ever any marijuana in the Yukon, at any point whatsoever. Both Mr. Mozeak and Davis denied smoking marijuana in general, there is no evidence contradicting those statements, and Davis specifically is asthmatic, a fact which she told Taylor at the time and which strongly corroborates that her assertion that she was not a smoker. *See* Ex. A-1 at 35:30-43 (Davis stating she has "asthma bad" and actively using her inhaler in front of Taylor while being escorted from the car ahead of search).

39. Moreover, no evidence of any marijuana was located during the search of the car. Of course, the results of a search do not dictate whether cause existed for the search in the first place. But the absence of any sign of marijuana lends some corroboration to Mr. Mozeak and Davis's claims that they did not have or smoke any, and to their protestations that there was never

an odor of marijuana in the car for Taylor to detect.

40.     Additionally, the timing of Taylor's claim to have smelled marijuana is questionable. Notably, Taylor claimed to have suspected criminal activity and made the decision to call in a K9 unit less than *four minutes* into the stop. He did not claim to smell marijuana until after that, the very next time he was able to approach the vehicle after his decision had been made. *Compare* Ex. B at 3 (stating he smelled marijuana while talking to Davis) *with* Ex. A-1 at 20:52 (9 minutes 12 seconds into the stop). Officers in general are well aware that the odor of marijuana gives them *carte blanche* to search a vehicle, so the fact that Taylor only claimed to smell marijuana after he had decided to search the car is highly suspect.

41.     On the flip side, despite having claimed the ability to conduct a probable cause search—and after explicitly informing Mr. Mozeak that he *was* going to conduct that search—Taylor still waited for the K9 unit to arrive before doing any searching. This curious decision further undermines his claim to have smelled marijuana, because there would be no need for a dog if the odor could be detected by a human.

42.     Finally, Taylor's only proffered explanations for how he could smell marijuana make no sense. In light of both Mr. Mozeak and Davis protesting that any such smell existed, Taylor offered only that "it's a rental" –and therefore the smell could have been in the car before Mr. Mozeak and Davis got it—and that the odor "lays on" money and "emits." These explanations make no sense.

43.     First, the rental car had been in Mr. Mozeak and Davis's control for nearly 24 hours at the time of the stop, making it extremely unlikely that the smell of *unburnt* marijuana would have still been lingering from a previous renter. And if Taylor truly believed that the smell he detected was consistent with possession from a previous renter a day or more earlier, it is unclear

how that would give him reasonable suspicion that the individuals in the car now had any evidence of criminal activity on them.

44.    Second, even if Taylor's claim about the smell "laying on" currency and "emit[ting]" were true, he himself stated that the money he located was vacuum-sealed, preventing any odor from escaping. It also fails to explain how Mr. Mozeak and Davis would not be able to detect that scent even when he could.

45.    In sum, Taylor's claims about smelling marijuana lack sufficient indicia of reliability to be credible and should be disregarded.

## III-    INSUFFICIENT EVIDENCE EXISTS TO CORROBORATE THE VALIDITY OF THE DOG SNIFF

46.    A detection dog's sniff is the same as any other method of determining probable cause, and as such is not subject to "rigid rule, bright-line tests, and mechanistic inquiries." *Florida v. Harris*, 568 U.S. 237, 244 (2013). At the same time, neither is it inviolate. The government bears the burden of producing evidence in the form of "proof from controlled settings that a dog performs reliably in detecting drugs," or some other similar evidence sufficient to show "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id.* at 248.

47.    Even where the government has produced such evidence,

> A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings. … And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or

not), or if the team was working under unfamiliar conditions.

*Harris*, 568 U.S. at 247.

48.     Here, the government has provided no evidence of any kind—other than the bald statement of Taylor—that the K9 even alerted, let alone that its alert was reliable. Absent such evidence, even if the prolonged traffic stop were permissible, the resulting search would not be and suppression would still be appropriate.

## IV-    THE FRUITS OF THE UNCONSTITUTIONAL SEARCH MUST BE SUPPRESSED.

49.     Evidence seized in direct violation of a defendant's Fourth Amendment rights is inherently tainted "fruit of the poisonous tree" and must be suppressed. *Wong Sun v United States*, 371 U.S. 471, 488 (1963). Evidence discovered as the result of the Fourth Amendment violation is also "fruit of the poisonous tree" that must be suppressed under the exclusionary rule. *United States v. Boden*, 854 F.2d 983, 990 (7th Cir. 1988); *United States v. Terry*, 909 F.3d 716, 720 (4th Cir. 2018) (citing *Utah v. Strieff*, 136 S.Ct. 2056, 2061 (2016) ("defendants may seek to suppress not only evidence obtained as a direct result of an illegal search but also evidence later discovered as a result of that search.")) Evidence obtained through a chain of causation that began with a Fourth Amendment violation is admissible only if, "granting establishment of the primary illegality, the evidence to which instant objection is made has been come at . . .  by means sufficiently distinguishable to be purged of primary taint." *Wong Sun*, 371 U.S. at 488 (quoting Maguire, Evidence of Guilt, 221 (1959)).

50.     Here, there is a causal connection between the prolonged traffic stop and the unlawful search of the Yukon. But for the prolonged stop, Taylor could not have obtained a K9 sniff, nor used that to justify his search and seizure of the currency at issue in this case. Thus, the currency seizure is the direct fruit of Taylor's unlawful prolonged stop, and must be suppressed.

## V- MR. MOZEAK REQUESTS AN EVIDENTIARY HEARING

51.     Mr. Mozeak requests an evidentiary hearing on this motion. To the extent the government argues the evidence should not be suppressed, there are "material facts that affect the resolution of" this motion, and the "appropriate way to resolve the conflict is by holding an evidentiary hearing." *United States v. Taylor*, 13 F.3d 786, 789 (4th Cir. 1994).

**WHEREFORE,** Mr. Mozeak respectfully requests that the Court hold an evidentiary hearing and suppress the evidence located subsequent to the unconstitutional search and seizure in this case.

Respectfully submitted:


s/ John Parke Davis
John Parke Davis
N.C. Bar No. 34427
Federal Public Defender
Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
(704) 374-0720
(704) 374-0722 Fax
jp_davis@fd.org
*Attorney for Jonathan Mozeak*


DATE:  January 21, 2026

## AI CERTIFICATION

Pursuant to Standing Order No. 3:24-mc-104, I hereby certify the following:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

        Respectfully submitted:

        s/ John Parke Davis
        John Parke Davis
        N.C. Bar No. 34427
        Federal Public Defender
        Western District of North Carolina
        129 West Trade Street, Suite 300
        Charlotte, NC 28202
        (704) 374-0720
        (704) 374-0722 Fax
        jp_davis@fd.org
        *Attorney for Jonathan Mozeak*

DATE: January 21, 2026